IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:15-CV-425-FL

| | | |
|---|---|---|
| TONY W. WINDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND RECOMMENDATION** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Tony W. Windham ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying his application for a period of disability and disability insurance benefits ("DIB") on the grounds that he is not disabled. The case is before the court on the parties' motions for judgment on the pleadings. (D.E. 17, 19). Both filed memoranda in support of their respective motions. (D.E. 18, 20). The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 25 Mar. 2016 Text Order). For the reasons set forth below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be denied, and the final decision of the Commissioner be affirmed.

I.      **BACKGROUND**

A.      **Case History**

Plaintiff filed an application for DIB on 16 November 2011, alleging a disability onset date of 11 November 2011. Transcript of Proceedings ("Tr.") 13. The application was denied initially and upon reconsideration, and a request for a hearing was timely filed. Tr. 13. On 25

October 2013, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff and a vocational expert testified. Tr. 26-49. The ALJ issued a decision denying plaintiff's claims on 14 January 2014. Tr. 13-21. Plaintiff timely requested review by the Appeals Council. Tr. 7-8. On 25 June 2015, the Appeals Council denied the request for review. Tr. 1-4. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 404.981. On 25 August 2015, plaintiff commenced this proceeding for judicial review, pursuant to 42 U.S.C. § 405(g). (*See In Forma Pauperis* ("IFP") Mot. (D.E. 1); Order Allowing IFP Mot. (D.E. 5); Compl. (D.E. 6)).

### B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R. § 404.1509], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings ["Listings"] in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.  . . . .

20 C.F.R. § 404.1520(a)(4); *see Monroe v. Colvin*, No. 15-1098, __ F.3d __, 2016 WL 3349355, at * 1-2 (4th Cir. 16 June 2016).

The burden of proof and production rests with the claimant during the first four steps of the analysis.  *Monroe*, 2016 WL 3349355, at *2; *Pass*, 65 F.3d at 1203.  The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy.  *Monroe*, 2016 WL 3349355, at *2; *Pass*, 65 F.3d at 1203.

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process.  *Id.*

### C.     ALJ's Findings

Plaintiff was 50 years old on the alleged onset date of disability and 52 years old on the date of the hearing.  *See, e.g.*, Tr. 20 ¶ 7.  The ALJ found that plaintiff has at least a high school education (Tr. 20 ¶ 8) and past relevant work as an automobile mechanic (Tr. 19 ¶ 6).

Applying the five-step analysis of 20 C.F.R. § 404.1520(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the date of alleged onset of disability.  Tr. 15 ¶ 2.  At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations:  right below-knee amputation with knee arthritis.  Tr. 15 ¶ 3.  The amputation occurred in November 2006 as a result of complications from plaintiff's fracture of his lower right leg in a fall off a ladder in August 2006.  Tr. 17 ¶ 5.  Plaintiff subsequently obtained a prosthesis for his right leg.  Tr. 17 ¶ 5.  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the Listings.  Tr. 15 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant can push and/or pull with the right lower extremity on an occasional basis; occasionally climb ramps and stairs; cannot climb ladders, ropes, and scaffolds; can frequently stoop and occasionally perform other postural [activities]; and can have no concentrated exposure to hazards.

Tr. 16 ¶ 5.  The ALJ further stated that "[l]ight work in this case is defined as involving occasional lifting and/or carrying 20 pounds; frequent lifting and/or carrying 10 pounds; standing and/or walking (with normal breaks) six hours in an eight-hour workday; sitting (with normal

breaks) six hours in an eight-hour workday; and pushing and/or pulling unlimited other than as shown for lift[ing] and/or carry[ing] or as described above." Tr. 16 ¶ 5.[1]

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was unable to perform his past relevant work. Tr. 19 ¶ 6. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of electronics worker, x-ray inspector, and cashier. Tr. 20 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled from the date of the alleged onset of disability, 11 November 2011, through the date of the decision, 14 January 2014. Tr. 21 ¶ 11.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Id.*

---

[1] *See Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," 1991 WL 688702. "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. § 404.1567.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## III.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that this case should be remanded for the award of benefits or, in the alternative, a new hearing on the grounds that the ALJ erred in assessing his credibility and certain treating source opinion evidence. The opinions are those of primary care physician Anwar D. Al-Haidary, M.D., M.Sc., M.R.C.P. and physician's assistant Mark P. Randolph, PA-C ("PA Randolph"), both of Wilson Nephrology-Internal Medicine, PA ("Wilson Medicine"), and the opinions of prosthetist Cara Wolfe, CPO ("CPO Wolfe") of the Center for Orthotic & Prosthetic Care ("Raleigh Prosthetic"). The court will address each contention in turn.

## IV.     ALJ'S ASSESSMENT OF PLAINTIFF'S CREDIBILITY

### A.     Applicable Legal Principles

The ALJ's assessment of a claimant's credibility involves a two-step process.  Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2 (2 July 1996); *accord Craig v. Chafer*, 76 F.3d 585, 589 (4th Cir. 1996).  First, the ALJ must determine whether the claimant's medically documented impairments could cause the claimant's alleged symptoms.  Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2.  Next, the ALJ must evaluate the claimant's statements concerning those symptoms.  *Id.*; *see also* 20 C.F.R. § 404.1529 (setting out factors in evaluation of a claimant's pain and other symptoms).  If the ALJ does not find the claimant's statements to be credible, the ALJ must cite "specific reasons" for that finding that are "supported by the evidence."  Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2, 4; *Jonson v. Colvin*, No. 12cv1742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *accord Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

### B.     Analysis

As summarized by the ALJ, plaintiff testified at the hearing in relevant part as follows:

As to his right knee, the claimant stated it would swell and he could not put on his prosthetic because it caused horrible pain.  His knee is fine when he is not working.  The prosthetic fits fine but wearing it causes problems, he stated. Overall, the claimant alleged he can only wear the prosthetic 20-30 minutes in the summer time because it sweats and then he has to take it off for five to 10 minutes.  He can sit 30 minutes and walk five to 10 minutes and then needs to sit down again for another 30 minutes.

Tr. 17 ¶ 5 (summarizing plaintiff's testimony at Tr. 35-38).  The vocational expert testified that, if deemed credible, plaintiff's allegations regarding these impairments would preclude him from working.  Tr. 47.

In assessing plaintiff's allegations, the ALJ made the step-one finding that plaintiff's "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms." Tr. 18 ¶ 5. At the second step of the credibility assessment, the ALJ found that plaintiff's allegations were not fully credible. Tr. 18 ¶ 5. He stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." Tr. 18 ¶ 5.

The ALJ provided four specific reasons for his credibility determination. Tr. 18-19 ¶ 5. He stated:

> In terms of the claimant's alleged disabling conditions, [1] the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. [2] Although the claimant has received various forms of treatment for the allegedly disabling symptoms, the record also reveals that the treatment has been generally successful in controlling those symptoms. [3] The record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date. The fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work. [4] In addition, the claimant testified he looked for work after he stopped working as an auto mechanic.

Tr. 18-19 ¶ 5.

Each of the reasons cited by the ALJ is supported by substantial evidence, including evidence recited by the ALJ. With respect to his activities of daily living, the ALJ found that "the claimant acknowledged being able to wash dishes, cut the yard, walk the dog, play handicapped golf (15 holes at a time), and drive older model vehicles because the break and accelerator pedals are close together." Tr. 17 ¶ 5 (referencing hearing testimony at Tr. 41-42). According to a report by a Social Security official dated 29 December 2011 on a telephone contact with plaintiff, he reported similar daily activities (other than dog walking). Tr. 231. The

note by CPO Wolfe on her 18 July 2012 visit with plaintiff noted that he "is active in the community going over all different terrains." Tr. 372.

As to the treatment plaintiff received, it included periodic adjustment of the prosthesis for his right leg. The ALJ found, for example, as follows:

> Follow-up notes from Raleigh Prosthetic dated December 12, 2007, show the claimant complained of pain f[ro]m the prosthetic socket even though additional padding had been previously added. The claimant was fitted for a new prosthesis on January 16, 2008. With the new prosthesis, he walked very well and stated he had good comfort. He had prosthetic adjustments and part replacements in March 2009, December 2009, August 2010, and May 2011. (Ex. 4F, 10F, 15F).
>
> . . . Raleigh Prosthetic notes from November 23, 2011, show the prosthetic sleeves and liner were replaced. The provider noted the current prosthetic foot did not allow enough inversion and eversion, making ambulation over uneven terrain very difficult. A switch of device was anticipated to improve comfort and gait efficiency. Additional cushioning was added in May 2012 after very slight skin discoloration was noted and the claimant reported he was experiencing some bruising. (Ex.4F, 13F, 15F).

Tr. 17-18 ¶ 5.

Plaintiff also received medication for pain, swelling, and occasional infections resulting from use of the prosthesis, which is noted in the exhibits cited by the ALJ. *See*, *e.g.*, Tr. 332, 333 (29 Sept. 2011) (Ex. 6F); 335, 336 (1 Nov. 2011) (Ex. 6F); 337, 338 (2 Feb. 2012) (Ex. 6F); 376 (2 Feb. 2010) (Ex. 11F); 380 (2 Jan. 2012) (Ex. 11F); 414, 415 (3 May 2012) (Ex. 13F).

It is, of course, well settled that if a symptom can be reasonably controlled by treatment, including medication, it is not disabling. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ's finding that plaintiff's treatment has been "generally successful" in controlling his allegedly disabling symptoms finds support in, among other evidence, the evidence substantiating the other bases for his credibility assessment, namely, plaintiff's activities of daily living, his continuing to work for years after the amputation, and his looking for other work after the alleged onset of disability. Specific evidence includes, but is not limited

to, plaintiff's statement on 29 December 2011 as recited in a report of contact with a Social Security official that although he usually wears his prosthesis with some pain, the pain is not intolerable (Tr. 231); his report to Raleigh Prosthetic on 8 May 2012 that he had been doing well until recently when he noticed some bruising (which the ALJ noted in his decision at Tr. 18 ¶ 5) (Tr. 370); and the note on plaintiff's 17 October 2012 visit with CPO Wolfe stating that plaintiff's skin looked good and that he reported being able to walk up hills nicely (Tr. 373).

In addition, the record does not show recurrent, extended periods when plaintiff was unable to use his prosthesis. There is only one instance after his alleged onset of disability—a period of about three weeks starting around 13 May 2012—during which the record substantiates that plaintiff was unable to wear his prosthesis for more than part of a day. *See* Tr. 211, 217, 417. Such an impairment over the course of the more than two-year period of alleged disability, from November 2011 to January 2014, does not, of course, in itself establish disability and plaintiff does not contend that it does. The most recent prior instance in which the record shows that plaintiff could not use his prosthesis for a day or more was in June 2010 (and that period was limited to five days). *See* Tr. 377-78.

With respect to the ALJ's determination based on plaintiff's ability to work prior to the alleged onset of disability notwithstanding his right-leg impairment, it is undisputed that plaintiff did return to work after the amputation and continued working for several years. He testified to that effect at the hearing. *See* Tr. 32; 17 ¶ 5 (ALJ's reference to the testimony).

The ALJ's related determination that the impairment remained at "approximately"[2] the same level of severity after the alleged onset of disability is supported by substantial evidence. Tr. 18 ¶ 5. Among such evidence is medical records showing that prior to the alleged onset of

_____

[2] The ALJ's qualification that plaintiff's impairment was at "approximately" the same level of severity before the alleged onset of disability as after is consistent with his determination that plaintiff's exertional level dropped from medium work before the alleged onset to light work after it.

disability, plaintiff experienced pain, swelling, an occasional infection, and a period of days (referenced above) when he could not use the prosthesis, as he did after the alleged onset. *See*, *e.g.*, Tr. 307 (15 July 2009); 308 (30 Oct. 2009); 313 (23 July 2010); 332, 333 (29 Sept. 2011); 376 (2 Feb. 2010). The medical records also reflect continuity of the same basic course of treatment—medication for pain and related symptoms with periodic adjustment of the prosthesis. *See*, *e.g.*, Tr. 303 (4 Apr. 2008); 306 (4 Mar. 2009); 312 (9 Aug. 2010); 314 (16 May 2011); 332, 333 (29 Sept. 2011); 335, 336 (1 Nov. 2011); 337, 338 (2 Feb. 2012); 376 (2 Feb. 2010); 380 (2 Jan. 2012); 414, 415 (3 May 2012); 370 (8 May 2012); 372 (18 July 2012). In addition, there is the evidence of plaintiff's continued ability to engage in a range of activities of daily living.

Lastly, the fact that plaintiff attempted to find a job after his alleged onset of disability is undisputed. He testified at the hearing that he looked for other work after he stopped working in November 2011, but did not know how to do anything else. *See* Tr. 32; 17 ¶ 5 (ALJ's reference to the testimony).

Plaintiff argues that the ALJ erred in discrediting his credibility, in part, on the basis of his playing handicapped golf because his use of a handicapped golf cart between holes minimized his walking. But it is apparent from the record that the ALJ understood that plaintiff was using a golf cart. In the decision, the ALJ expressly referred to plaintiff's playing "handicapped golf." Tr. 17 ¶ 5. At the hearing, after plaintiff testified that he played "handicap golf," the ALJ asked him what it was. Tr. 41. Plaintiff explained, "Out there where I play at, they've got a handicap cart . . . and they let me drive all the way to the greens." Tr. 41. He added that he limited himself to 12 to 15 holes to avoid injury (*see* Tr. 41), a limitation the ALJ expressly mentioned in his decision (*see* Tr. 17 ¶ 5). Even with use of a handicap golf cart, plaintiff's playing golf entails a significant amount of walking and other physical functionality,

including the ability to operate a golf cart, that the ALJ could properly consider in evaluating plaintiff's credibility.

Plaintiff also contends that the evidence shows that the condition of his right leg deteriorated over time and became disabling by the alleged disability onset date of 11 November 2011, thereby reinforcing his credibility. Substantial evidence, though, supports the ALJ's contrary interpretation of the evidence, as discussed above.

The court concludes that the ALJ's determination of plaintiff's credibility is supported by substantial evidence and is based on proper legal standards. This challenge to the ALJ's decision should accordingly be rejected.

## V.    ALJ'S ASSESSMENT OF MEDICAL OPINION EVIDENCE

### A.    Applicable Legal Standards

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* § 404.1527(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D.W. Va. 2009) ("Pursuant to 20 C.F.R. § 404.1527(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *see*

*Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. Ruling 96-2p, 1996 WL 374188 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590. In this circumstance, the Regulations prescribe factors to be considered in determining the weight to be ascribed, including the length and nature of the treating relationship, the supportability of the opinions, and their consistency with the record. 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. § 404.1527(c)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

The factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") not given controlling weight also apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"), including physician's assistants. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *2, 4 (9 Aug. 2006); *see also* 20 C.F.R. § 404.1513(d) (partial listing of "other sources"). As with opinions from physicians and psychologists, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *6; *Napier*, 2013 WL 1856469, at *2. The fact that an opinion is from an acceptable medical source may justify giving that opinion greater weight than an opinion

from a source that is not an acceptable medical source, although circumstances can justify giving opinions of sources that are not acceptable sources greater weight. Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *5.

The same basic standards that govern evaluation of the opinions of treating medical sources not given controlling weight and explanation of the weight given such opinions apply to the evaluation of opinions of examining, but nontreating sources, and nonexamining sources. *See* 20 C.F.R. § 404.1527(c), (e); *Casey v. Colvin,* No. 4:14–cv–00004, 2015 WL 1810173, at *3 (W.D. Va. 12 Mar. 2015), *rep. & recommendation adopted by* 2015 WL 1810173, at *1 (21 Apr. 2015); *Napier v. Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. 1 May 2013). More weight is generally given to the opinions of a treating source than to the opinions of a nontreating examining source and to the opinions of an examining source than the opinions of a nonexamining source. *See* 20 C.F.R. § 404.1527(c)(1), (2). Under appropriate circumstances, however, the opinions of a nontreating examining source or a nonexamining source may be given more weight than those of a treating source. *See*, *e.g.*, Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (2 July 1996).

Opinions from medical sources on the ultimate issue of disability and other issues reserved to the Commissioner are not entitled to any special weight based on their source. *See* 20 C.F.R. § 404.1527(d); Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2, 5 (2 July 1996). But these opinions must still be evaluated and accorded appropriate weight. *See* Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

**B.** **Opinions of PA Randolph and Dr. Al-Haidary of Wilson Medicine**

Plaintiff was treated for his right leg at Wilson Medicine from 29 September 2011 until at least 31 May 2012. *See* Tr. 332-38; 414-19.[3] In a letter dated 31 May 2012 and addressed "To Whom It May Concern," PA Randolph and Dr. Al-Haidary stated:

> Mr. Tony Windham suffered a fracture to his right tibia [and] fibula which resulted in an amputation below the knee. He has had significant neuropathy in that leg as well as phantom pain. This prevents him from sitting longer than thirty (30) minutes at the time. Mr. Windham also has muscle spasms in that leg which prevents him from sleeping at night. He has infections in the joint which prevents him from using his prosthesis.
>
> All of the above limits him from activities of daily living and from working. I strongly recommend that he be evaluated for disability based on these findings.

Tr. 396. This letter recites complaints voiced by plaintiff for the first time at his visit with PA Randolph on the same date. Tr. 417-18. At that same visit, plaintiff stated that he had been turned down twice for disability.[4] Tr. 417.

In his decision, the ALJ first summarized these opinions as follows, erroneously attributing them to PA Randolph alone:

> Mar[k] Randolph, PA-C of Wilson Medicine drafted a letter dated May 31, 2012, attesting the claimant has had significant neuropathy in his right leg as well as phantom pain. This prevents him from sitting longer than 30 minutes at the time. He has muscle spasms that prevent him from sleeping at night and infections in the joint that prevent him from using his prosthesis. All of the above limits him from activities of daily living and from working. I strongly recommend that he be evaluated for disability based on these findings. (Ex. 12F).

Tr. 18 ¶ 5.

The ALJ then stated that he gave these opinions, referred to collectively, "little weight" for three principal reasons:

---

[3] Duplicates of the records at Tr. 332-38 appear at Tr. 398-400 and 409-13. Plaintiff also had an office visit at Wilson Medicine on 5 June 2012, but it did not concern his leg. *See* Tr. 420-21.

[4] This statement may be a reference to the initial denial of his instant application for DIB on 30 December 2011 and denial upon reconsideration on 5 April 2012.

> [1] This opinion is given little weight as M[r]. Randolph is not an acceptable medical source. [2] Other notes indicate the claimant was able to use [the] prosthesis albeit several adjustments were made and additional cushioning was added. [3] Moreover, there are 2012 notes that the claimant played golf and did well walking on uneven terrains. He expressed excitement in anticipation of trying . . . to play golf with his prosthesis. (Ex. 10F).

Tr. 18 ¶ 5.

Plaintiff does not object specifically to the finding that there are office visit notes showing that plaintiff was able to use his prosthesis subject to adjustments and addition of cushioning. Substantial evidence supports this finding. *See*, *e.g.*, Tr. 372, 373.

Plaintiff does, however, object to the ALJ's reliance on plaintiff's golfing activity to discredit the opinions. As previously discussed, however, the ALJ could properly rely on plaintiff's golfing in evaluating the functionality he retained despite his amputation. The additional specific findings that plaintiff did well walking on uneven terrains and expressed excitement about playing golf with a modified prosthesis are well grounded in the record. *See* Tr. 372.

Plaintiff also objects that to the extent that the 31 May 2012 letter reflects the opinions of Dr. Al-Haidary, an acceptable medical source, the ALJ erred in discounting them on the grounds that they are not from an acceptable medical source. The Commissioner concedes that the ALJ erred in this regard. The error was, of course, rooted in the ALJ's failure to recognize that the letter was signed by Dr. Al-Haidary, along with PA Randolph.

Plaintiff has not demonstrated, however, that the error by the ALJ was harmful, specifically, that without the error it is reasonably possible that the ALJ would have reached a different outcome on the issue of disability or, for that matter, even on the assessment of the opinions in the 31 May 2012 letter. *See*, *e.g.*, *Garner v. Astrue*, 436 F. App'x 224, 226 n.* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Huffman v. Colvin*, No.

1:10CV537, 2013 WL 4431964, at *4 & n. 7, 7 (M.D.N.C. 14 Aug. 2013); *Presnell v. Colvin*, No. 1:12–CV–299–FDW, 2013 WL 4079214, at *6 (W.D.N.C. 13 Aug. 2013); *see also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (noting that an error is harmless when, among other circumstances, the ALJ would have reached the same result absent the error). Among other reasons, as discussed, the other bases given by the ALJ for discrediting Dr. Al-Haidary's opinions were proper and are arguably sufficient themselves to justify giving the opinions little weight. In addition, the medical records do not show that Dr. Al-Haidary ever personally treated plaintiff, although plaintiff testified that Dr. Al-Haidary did treat him and oversee his treatment. *See* Tr. 34. The records from Wilson Medicine identify PA Randolph as the "Rendering Provider" at each of his five visits there regarding his right leg. *See* Tr. 332, 335, 337, 414, 417. While the notes on one visit were approved by Dr. Al-Haidary (*see* Tr. 335, 336), the others state that they were waiting approval by him (*see*, *e.g.*, Tr. 332, 337, 414, 417). The seemingly minimally documented involvement Dr. Al-Haidary had with plaintiff tends to limit the weight that could properly be given to his opinions. *See* 20 C.F.R. § 404.1527(c)(1), (2).

Further, the ALJ's discrediting of the opinions as to PA Randolph was proper. The ALJ did not, of course, err in discounting these opinions with respect to PA Randolph based on his not being an acceptable medical source because a physician's assistant is not an acceptable medical source. *See* 20 C.F.R. § 404.1513(d)(1). Moreover, the other reasons given by the ALJ for discrediting these opinions are also proper as to PA Randolph. Plaintiff has not shown that Dr. Al-Haidary's status as an acceptable medical source, particularly given his minimal involvement with plaintiff, could reasonably be expected to lead to a different assessment of these same opinions.

Additionally, as noted, the 31 May 2012 letter states that plaintiff's alleged impairments "limit[] him . . . from working." Tr. 396. To the extent that this statement is deemed to be an opinion that plaintiff is disabled, it is not entitled to any special weight based on its source. *See* 20 C.F.R. § 404.1527(d); Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2, 5.

Lastly, the evidence as a whole tending to show that plaintiff is disabled by his right leg impairment is of limited strength. For example, as previously discussed, the record does not reflect complaints by plaintiff about his purportedly disabling inability to sit for longer than 30 minutes until 31 May 2012 (*see* Tr. 418) and show only one extended period after the alleged onset of disability when he was unable to use his prosthesis (*see* Tr. 211). Moreover, two nonexamining state agency consulting physicians determined in physical RFC assessments on 30 December 2011 and 3 April 2012, respectively, that plaintiff could perform a limited range of light work, as did the ALJ. *See* Tr. 56-58, 67-69.

The court concludes that the ALJ did not commit reversible error in his assessment of the opinions of PA Randolph and Dr. Al-Haidary. Plaintiff's challenge to the assessment should accordingly be rejected.[5]

### C. Opinions of CPO Wolfe

Plaintiff was treated at Raleigh Prosthetic from December 2007 to arguably as late as 15 July 2013. *See* Tr. 299, 458. In a letter telefax-stamped 23 July 2013[6] and addressed "To Whom it may concern," CPO Wolfe stated:

---

[5] The record also contains a letter from Wilson Medicine dated 5 June 2013 that is worded identically to the 31 May 2012 letter, but is signed by an adult nurse practitioner, which is not an acceptable medical source. *See* Tr. 460; 20 C.F.R. § 404.1513(d)(1). The ALJ gave this statement "little weight" for the same reasons he gave the 31 May 2012 letter little weight. Tr. 18 ¶ 5. Plaintiff does not challenge this determination by the ALJ. In any event, it is proper for the same reasons his determination regarding PA Randolph's opinions in the 31 May 2012 letter is proper.

[6] The letter is dated 15 July 2012, but refers to an office visit by plaintiff with CPO Wolfe on Monday, 15 July 2013. There does not appear to be a note in the record on this purported visit. Nonetheless, 15 July 2013 was a Monday, whereas 15 July 2012 was not.

I am the prosthetist that works with Mr. Windham to make sure he is able to perform what he needs be able to do for ambulation. He has a well fitting prosthesis that we maintain and make sure is working properly yearly. Mr. Windham's prosthesis is well maintained and provides appropriate function for walking and daily activities, but without usage of the prosthesis Mr. Windham would have to use crutches and hop on his sound limb for ambulation. This would hinder his ability to perform tasks while standing and u[]sage of his hands. His prosthesis fits well and is in good working order as of the last visit to my office on Monday July 15th, 2013.

Tr. 458.

In his decision, the ALJ described CPO Wolfe's opinions as "significant." Tr. 18 ¶ 5. He

stated:

Cara Wolfe, CPO of the Raleigh Prosthetic drafted a letter faxed stamped July 23, 2013. She stated the claimant's prosthesis is well maintained and provides appropriate function for walking and daily activities. However, without usage of the prosthesis the claimant would have to use crutches and hop on his sound limb for ambulation — this would hinder his ability to perform tasks while standing and usage of his hand. She stated his prosthesis was in good working order as of his last office visit on July 15, 2013. (Ex. 16F). This opinion is significant as the provider did not indicate the claimant would be precluded from walking and participating in daily activities with use of his prosthetic device.

Tr. 18 ¶ 5.

Plaintiff challenges the ALJ's assessment of CPO Wolfe's opinions on the grounds that he did not take into account the swelling and ulceration that plaintiff contends seriously impedes his use of the prosthesis. But the ALJ's review of CPO Wolfe's opinions is unquestionably accurate. Indeed, as can be seen, the ALJ virtually paraphrases CPO Wolfe's opinions. The frequency with which plaintiff is purportedly unable to use the prosthesis is simply beyond the scope of the opinions. The opinion expressed by CPO Wolfe that the prosthesis functions well when used is of obvious significance, as the ALJ found.

The court concludes that the ALJ's assessment of the opinions of CPO Wolfe is supported by substantial evidence and based on proper legal standards. The court should accordingly reject plaintiff's challenge to it.

## VI.    CONCLUSION

For the foregoing reasons, the court concludes that the Commissioner's decision is supported by substantial evidence of record and, except for harmless error, is based on proper legal standards. IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 19) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 17) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 6 July 2016 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure**

**to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after filing of the objections.

This 22nd day of June 2016.

James E. Gates
United States Magistrate Judge